GIBSON, DUNN & CRUTCHER LLP
Lee R. Crain (*pro hac vice*)
lcrain@gibsondunn.com
200 Park Avenue, 47th Floor
New York, New York 10166
Tel.: 212-351-4000
Fax: 212-351-4035

GIBSON, DUNN & CRUTCHER LLP
Rachel S. Brass (SBN 219301)
rbrass@gibsondunn.com
Caiti Busch (SBN 318534)
cbusch@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, California 94105-2933
Tel.: 415-393-8200
Fax: 415-393-8306

*Attorneys for Plaintiff Michael Cavness*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL CAVNESS,<br><br>                    Plaintiff,<br><br>          v.<br><br>FRANK WINCH, SCOTT NEU, AUSTIN MORRIS, R. GONZALEZ, EVAN STAEHELY, MARTIN LOGUE, AND SCOTT BERGSTRESSER,<br><br>                    Defendants. | CASE NO. 3:14-cv-03403-EDL<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

Michael Cavness, by and through his attorneys, Gibson, Dunn & Crutcher LLP, for his First Amended Complaint against Defendants, alleges as follows:

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), because this action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United

States Constitution.

2. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

**PARTIES AND PROCEDURE**

3. Plaintiff MICHAEL CAVNESS ("Plaintiff" or "Cavness") was a pretrial detainee at San Francisco County Jail No. 4 in October 2011, including on October 13, 2011, when he was brutally assaulted by a fellow inmate, Raymond Saunders ("Saunders").

4. Defendant FRANK WINCH was, in October 2011 and at all relevant times, a Lieutenant or Deputy employed at San Francisco County Jail No. 4.

5. Defendants SCOTT NEU, AUSTIN MORRIS, R. GONZALEZ, EVAN STAEHELY, MARTIN LOGUE, and SCOTT BERGSTRESSER (the "Mainline Deputy Defendants") were deputies employed at San Francisco County Jail No. 4 in October 2011.  The Mainline Deputy Defendants were on duty on or around October 12-13, 2011 and posted to the mainline corridor of the jail, where they were able to communicate with various inmates, including those in Cell B2 where Plaintiff was housed.  These deputies are required to be observant; they also work together in close quarters and communicate with each other about the inmates in their charge.

6. Several of the Mainline Deputy Defendants have been criminally charged and civilly sued for running a "fight club" at the jail, forcing inmates to fight one another, gambling on the results, threatening inmates with retribution if they did not comply, and covering up the illicit fights. Ex. 1.[1]  Defendants Neu and Staehely were named as defendants in civil suits regarding the jail's fight club.  And three deputies, including Defendant Neu, were criminally charged.

---

[1] The exhibits attached hereto are incorporated by reference into this First Amended Complaint.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
CASE 3:14-cv-03403-EDL

7. This Amended Complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

## FACTS GIVING RISE TO THE COMPLAINT

***A.  Mr. Cavness's Right to Be Protected From Serious Harm Was Violated.***

8. On October 13, 2011, Michael Cavness, a pretrial detainee at San Francisco County Jail No. 4, was brutally assaulted in his cell by his cellmate Raymond Saunders. Saunders broke Mr. Cavness's ankle, severed a muscle and tendon in his leg, fractured Mr. Cavness's nose and face, and broke two of his ribs. Mr. Cavness's fractured ankle required surgery, and he now has a metal rod fused to his bone. To this day, Mr. Cavness continues to suffer from his injuries, including persistent leg pain attributable to the metal rod surgically fused therein, pain and stiffness in the leg, neuropathy, and sustained nerve damage, among other physical injuries. Mr. Cavness also suffers from psychological ailments, including anxiety, acute stress, depression, inability to sleep, an inability to trust others, and fear of those around him, among other mental and psychological injuries.

9. Defendants had the power, knowledge, and responsibility to protect Mr. Cavness from this assault, but they violated their duty to do so. Indeed, they knew that Mr. Cavness was at risk of assault because Mr. Cavness had repeatedly warned deputies patrolling the mainline that he was at risk. The assault could easily have been avoided by moving Mr. Cavness to another cell, which was the procedure mandated by Jail policy. Instead, they idly sat by and allowed Mr. Cavness to be savagely beaten by an inmate they knew posed a grave threat.

10. Upon information and belief, each Defendant knew that Mr. Cavness was in danger. Mr. Cavness was housed on the mainline corridor of the jail in Cell B2. In the days leading up to the assault, Mr. Cavness informed every deputy with whom he interacted, including Defendant Winch and other deputies patrolling the mainline, that Saunders had threatened Mr. Cavness directly and that Mr. Cavness felt unsafe staying in Cell B2. Although Mr. Cavness does not remember the names of

each deputy with whom he spoke, the deputies patrolling the jail's mainline during the relevant period were Defendants Scott Neu, Austin Morris, R. Gonzalez, Evan Staehely, Martin Logue, and Scott Bergstresser. These deputies were tasked with observing the cells, being aware of their surroundings and the inmates in their charge, and communicating with other deputies regarding threats to staff or the inmate population.

11. Even before Mr. Cavness expressed his concern that he was in danger of being assaulted, Defendants knew that Saunders was a threat to inmate safety. Inmate Saunders had "a history of assaultive behavior and disruptive behavior," according to a Sergeant familiar with Saunders. Upon information and belief, Saunders had assaulted at least one other inmate in Cell B2 before he assaulted Mr. Cavness. In fact, just a few weeks before the assault, Saunders spent time in administrative segregation (solitary confinement) for assaulting another inmate. He was placed in Cell B2 just a few days before assaulting Mr. Cavness. While in Cell B2, Saunders directly threatened not only Mr. Cavness in the week leading up to the assault, but also several of Mr. Cavness's fellow inmates in the weeks before.

12. Upon information and belief, Saunders's violent and aggressive history was well-known to deputies at County Jail No. 4, including Defendants. Saunders was a violent inmate and a bully. Deputies in County Jail No. 4 know which inmates are violent and which are bullies in each cell at any given time. Their jobs require that they understand which inmates may cause trouble, and which inmates might be targets. They also must work as a team and communicate those understandings among themselves. As such, while they patrol, the deputies observe the inmates through the cell windows and listen through the bars to determine which inmates are bullies and need additional supervision and which inmates may be targets in need of additional protection. The deputies also know which inmates have recently been reintegrated from administrative segregation and the reasons why the inmates were housed there.

13. As such, Defendants knew about Saunders's violent history and his stint in administrative segregation. Likewise, they had observed Saunders's interactions with other inmates as they patrolled. This is particularly true of Saunders because he was the only inmate in Cell B2 wearing red. (A red uniform represents that an inmate is an escape risk.)

14. In the days prior to the assault, Mr. Cavness told Defendant Winch and several Mainline Deputy Defendants directly that he was afraid of remaining in the cell because he was being threatened by another inmate in his cell (Cell B2). Given the deputies' awareness of Saunders's status as a violent individual and the red-clothed bully in Cell B2, they would have known that Saunders was the inmate threatening Mr. Cavness. Mr. Cavness asked to be moved from Cell B2 to get away from Saunders, who presented a great risk to Mr. Cavness's safety.

15. Jail policy and practice require that where an inmate faces risk of harm from other inmates in the same cell, deputies are to immediately move the inmate. Jail policy states that "[p]risoners have the right to be reasonably protected from serious harm. This includes the right to be protected from harm inflicted by others . . . ." To best serve this policy, deputies faced with inmates claiming threats to their safety immediately are supposed to move those inmates from their cells, allowing deputies to investigate and assess the credibility of the complaint while the inmate is at least temporarily placed in a safe location.

16. Immediate removal of inmates from potentially dangerous situations is the appropriate practice of deputies in County Jail No. 4, and failing to do so is a derogation of duty. A reasonable deputy knows that if he leaves an inmate in his cell despite a potential threat to that inmate's safety, the inmate is, as one deputy has testified, "bound to . . . get assaulted."

17. The need to move a threatened inmate is even more pressing when the inmate posing the threat is someone with a known history of violent behavior, like inmate Saunders.

18. Jail policies apply equally to deputies and supervisors. Like deputies, a supervisor has

an obligation to keep inmates safe.  Although a supervisor is free to delegate to another deputy the responsibility to remove an inmate from a dangerous situation, Defendant Winch has stated that supervisors have the obligation to confirm that the move occurs.  If the move does not occur, a supervisor needs to personally ensure that it occurs prior to leaving his or her shift.

19.   Defendants did not comply with these policies with respect to Mr. Cavness.  Despite receiving and being aware of multiple complaints from Mr. Cavness that another inmate was threatening him with physical harm, knowing inmate Saunders's violent history, and understanding that policy and proper practice dictated removing Mr. Cavness "automatically," neither Defendant Winch nor any of the Mainline Deputy Defendants ever moved Mr. Cavness out of Cell B2.  Instead of removing him immediately, Defendant Winch told Mr. Cavness that he understood and that either he or another deputy would move Mr. Cavness out of the cell.  That did not happen.

20.   There is no good reason for this failure to act.  Defendant Winch had no reason to believe that Mr. Cavness was lying about or exaggerating the threat he faced.  Indeed, he told Mr. Cavness that he should be moved, but Defendant Winch failed to act immediately as required by the jail policy.

21.   Like Defendant Winch, several Mainline Deputy Defendants ignored Mr. Cavness's complaints outright.  The day before or the day of the assault, one of the Mainline Deputy Defendants informed Mr. Cavness that the deputy was aware of the threat and had orders to move Mr. Cavness.  But instead of immediately removing Mr. Cavness from Cell B2 as indicated by jail policy and common sense, the Defendant Deputy merely informed Mr. Cavness that he should move from his bed to another in the opposite corner of the twelve-bed cell.  That deputy never returned, and, within approximately 24 hours, Mr. Cavness was brutally assaulted.

22.   Mr. Cavness advised no fewer than three to four other of the Mainline Deputy Defendants of the threat to his safety, and they consciously ignored his pleas as well.

23. The Defendants had no rational basis for failing to move Mr. Cavness. Upon information and belief, County Jail No. 4 was not overpopulated in the days leading up to the October 13, 2011 assault. Beds were available in other cells, and Mr. Cavness could have been easily moved to another cell in a matter of a few minutes, which would have eliminated the known risk of assault. Defendant Winch has testified that there is always somewhere to move an inmate who needs to be moved, and that the bunks in the jail are usually not full. Inmate moves are not complicated, nor do they impose any substantial burdens on the prison. Inmates were permitted to move cells for any legitimate reason, including those far less serious than a threat to physical safety.

24. Despite all this, each Defendant chose to leave Mr. Cavness in his cell with an inmate they knew to be violent and who posed a direct threat to Mr. Cavness.

**B.** ***Defendants' Gross Derogation from Normal Policy and Custom and Their History of Similar Misconduct Implies an Agreement to Violate Mr. Cavness's Rights.***

25. The Defendants' conduct constitutes a gross derogation from policy and custom. Mr. Cavness directly complained to several deputies working the mainline about threats from a violent fellow inmate. Upon information and belief, the Mainline Deputy Defendants—whose job requires their constant vigilance and observation of the tier and the cells—saw, heard about, and/or discussed these complaints. Jail policy and practice dictated that they move Mr. Cavness from his cell immediately, and such a move would not have been difficult given the availability of other locations to which Mr. Cavness (or Saunders) could have been moved. This common and gross derogation of policy and custom implies an agreement amongst the Defendants to deprive Mr. Cavness of his constitutional right to be free from harm at the hands of other inmates. Defendants acted in concert to leave Mr. Cavness at risk.

26. This agreement to deprive Mr. Cavness of his rights isn't the first time deputies at County Jail No. 4—including several Mainline Deputy Defendants—have agreed to act together to affirmatively expose inmates to harm.

Gibson, Dunn & Crutcher LLP

27. In 2015, it first came to light that deputies of County Jail No. 4 ran a "fight club" at the jail, forcing inmates to fight one another, gambling on the results, threatening inmates with retribution if they did not comply, and covering up the illicit fights. Ex. 1. Multiple deputies, including Defendants Neu and Staehely, were named as defendants in civil suits regarding the jail's fight club. And three deputies, including Defendant Neu, were criminally charged, including with assault, directing an assault, making criminal threats, cruelty to a prisoner, and failure to perform an official duty. In bringing these charges, the San Francisco District Attorney condemned the deputies for "subjecting inmates who are in the care and custody of the state to degrading and inhumane treatment" and "making a mockery of our justice system." Ex. 2.

28. Defendant Neu was the ringleader of this coerced fight club. On several occasions, he forced inmates to fight, threatening to "fuck [them] up" if they did not comply, and also threatening them with disciplinary action and loss of privileges. Inmates stated that Defendant Neu "had created an environment of fear and retribution in County Jail No. 4." Ex. 3. Defendant Neu was ultimately charged with 17 felonies and misdemeanors for his actions.

29. The "fight club" is one of many instances in which Defendant Neu committed gross misconduct while on duty. In 2006, three inmates alleged that Neu sexually assaulted them. Ex. 4. In lieu of filing criminal charges, the San Francisco Sherriff's Department handled the investigation internally, allowing Neu to go back to work. Since then, he's been the subject of eleven investigations and at least four other civil lawsuits alleging gross impropriety. Ex. 5. Moreover, inmates witnessed Defendant Neu harassing other inmates as early as 2010, and he was accused of kicking and choking an inmate in 2012—the same period in which he was charged with the safety and care of Mr. Cavness. Ex. 6; Ex. 7.

Other deputies at the jail worked in concert with Neu to force inmates to fight one another, with one

of the deputies even providing tips on how an inmate might best his opponent in the next fight. They also conspired to keep the fights under wraps. At least two other deputies witnessed the fights, but were waived off by Defendant Neu and chose not to report what they'd seen, shirking their responsibilities to keep the inmates safe. Ex. 8.

31. Two Sheriffs of the San Francisco Sheriff's Department have recognized the rampant problems among deputies under their supervision over the past decade. In 2016, Ross Mirkarimi, Sherriff when Mr. Cavness was assaulted, recognized the need for "modernized training, policy reforms to dissuade misconduct, and the political will to correct abuse of power"—implicitly acknowledging the dearth of these safeguards to protect inmates from deputies, including at the time of Mr. Cavness's assault. Ex. 9. And the Sheriff who replaced Mirkarimi had to incorporate performance evaluations and more training, noting that the Department needed to "put a system in place that does hold people accountable." Ex. 10.

32. Likewise, the chief attorney of the public defender's office noted in 2015, when this misconduct came to light, that the acts by Defendant Neu and the other deputies "cannot occur without the implicit acceptance of otherwise law-abiding deputies." Ex. 11. As he noted, "[i]t is impossible for just two or three or even four deputies to commandeer the jail and stage fights without other deputies being aware of it." *Id.* The district attorney echoed those same concerns, stating "[c]ommon sense indicates that such conduct does not occur without the knowledge of numerous people." *Id.*

33. At the time of the assault on Mr. Cavness, the San Francisco County Sherriff's Department, and County Jail No. 4 specifically, was rife with abuses and attendant cover ups that led to numerous, continual violations of inmates' constitutional rights. Several of the Defendants have been publicly accused of conspiring together to force inmates to fight (or to willfully look past said fighting).

Gibson, Dunn & Crutcher LLP

34. Defendants' willful failure to move Mr. Cavness in the face of an imminent threat to his physical safety occurred in similar circumstances as the conscious, concerted abuse and mistreatment of inmates that came to light years later and which was often undertaken for the deputies' own entertainment. This longstanding conduct shows at best callous indifference and at worst active malevolence.

35. Mr. Cavness stated to several deputies on the mainline that he was facing a specific threat to his safety, and Defendants knew that Saunders was the prime suspect in posing the threats. Their failure to do anything—despite their knowledge of his pleas, the objectively serious risk to his safety, and the clear policy and practice dictating the scope of their obligations to take action to protect him from harm—demonstrates that they agreed (or that they had an implicit meeting of the minds) to ignore Mr. Cavness's requests, to throw him to the proverbial wolves, and to subject him to physical harm. Given the close quarters on the mainline and the necessity that deputies be observant, the deputies would have known of this danger. Their failure to respond to it evidences a common objective to ignore Mr. Cavness's call for help.

36. This conspiracy is further evidenced by Defendants' conduct *after* Mr. Cavness was assaulted, including in this litigation. Just weeks after the assault occurred, Mr. Cavness reported that he had pleaded to be removed from his cell based on a threat to his safety. But the Jail did not conduct any investigation of Mr. Cavness's claim. The deputies ignored Mr. Cavness again. Indeed, the only investigation the deputies conducted after the assault was to interview Mr. Cavness and his cellmate-witnesses. No investigation was ever done to determine whether Mr. Cavness had complained to deputies leading up to the assault, and not one of the Defendants was questioned about the events leading up to the assault—even though the Jail and Defendants have known for years that each of the Mainline Deputy Defendants was working on the mainline on the days that Mr. Cavness claims to have told several deputies of his pleas for rescue.

37. This conspiracy has continued during the pendency of this litigation. Defendants have known for years that the Mainline Deputy Defendants are responsible for the harm to Mr. Cavness. But deputies and the jail conspired to protect the Mainline Deputy Defendants and to prohibit their misconduct from coming to light. Defendants in this action actively and baselessly withheld documents Mr. Cavness needed to understand and expose this conspiracy as early as 2015 and continued to deny him the evidence he was entitled to in an effort to suppress their misconduct and misdeeds.

38. Defendants' conduct reflects the broader culture of abuse and concealment at San Francisco County Jail No. 4. The conspicuous failure of each and every Defendant to move Mr. Cavness in the face of serious physical threats to his safety, contrary to jail policy and practice, evidences an agreement amongst them in conformance with this abusive culture to deprive inmates, and specifically Mr. Cavness, of their constitutional rights, and to then cover up those violations.

### C. Defendants' Conduct and Conspiracy Results in Serious Harm to Mr. Cavness.

39. As a direct result of the Defendants' deliberate indifference to Mr. Cavness's safety and agreement not to intercede, on October 13, 2011, Mr. Cavness was assaulted by Saunders while Mr. Cavness slept in his bed. Saunders savagely attacked Mr. Cavness. Mr. Cavness attempted to defend himself, but Saunders overpowered him with his brutal assault.

40. Saunders broke Mr. Cavness's ankle, severed a muscle and tendon in his leg, fractured Mr. Cavness's nose and face, and broke two of his ribs. Mr. Cavness's fractured ankle required surgery, and he now has a metal rod fused to his bone. To this day, Mr. Cavness continues to suffer from his injuries, including persistent leg pain attributable to the metal rod surgically fused therein, pain and stiffness in the leg, neuropathy, and sustained nerve damage, among other physical injuries. Mr. Cavness also suffers from psychological ailments, including anxiety, acute stress, depression, inability to sleep, an inability to trust others, and fear of those around him, among other mental and

psychological injuries.

41. Mr. Cavness filed grievances with San Francisco County Jail about the incident on October 26, 2011; November 20, 2011; and December 2, 2011. These grievances went unremedied.

## PRELIMINARY ALLEGATIONS

42. Defendants, and each of them, are sued under 42 U.S.C. § 1983 and State law for violating and conspiring to violate the Fourteenth Amendment of the United States Constitution.

43. Plaintiff alleges that the conduct of Defendant Winch deprived him of his right to be free from violence at the hands of other inmates and caused him to suffer grievous harm and physical and emotional injuries while he was in the custody of Defendants.

44. Plaintiff also alleges that the conspiratorial conduct of the Mainline Deputy Defendants led directly to a deprivation of his right to be free from violence at the hands of other inmates and caused him to suffer grievous harm and physical and emotional injuries while he was in the custody of Defendants.

45. Each Defendant caused and is responsible for the unlawful conduct and resulting harms by, inter alia, failing to take action to prevent the assault on Mr. Cavness, intentionally ignoring the objectively serious threat of harm to Mr. Cavness, and refusing to protect Mr. Cavness's constitutional right to be free from harm inflicted by other inmates.

46. The acts and/or omissions of Defendants as alleged in this Amended Complaint were malicious and/or oppressive—done with a willful and conscious disregard for the Constitutional rights and basic welfare and safety of Mr. Cavness.

47. Alternatively, the acts and/or omissions of Defendant Winch as alleged in this Amended Complaint were committed with reckless disregard for the Constitutional rights and basic welfare and safety of Mr. Cavness and did not comport with what a reasonable officer similarly situated would have done to protect Mr. Cavness.

Gibson, Dunn & Crutcher LLP

48. This action is timely as against Defendant Winch and the Mainline Deputy Defendants because it was filed before the statute of limitations concluded.

49. Plaintiff therefore prays for an award of punitive and exemplary damages in an amount that will be stated according to proof.

**CAUSE OF ACTION NO. 1**
**VIOLATION OF PLAINTIFF'S CIVIL RIGHT TO BE FREE FROM VIOLENCE AT THE HANDS OF OTHER PRISONERS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. §§ 1983 & 1988)**

50. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 49 above as if set forth in full herein.

51. The Fourteenth Amendment to the United States Constitution protects the rights of pretrial detainees to be free from violence at the hands of other inmates, and prohibits deliberate indifference by law enforcement officers to the risk of violence to detainees at the hands of other inmates.

52. As alleged in paragraphs 1 through 49, Plaintiff informed Defendant Winch that Plaintiff was being threatened by fellow inmate Raymond Saunders, whom Defendant Winch knew to be violent. Despite telling Plaintiff that he would be moved, Defendant Winch never moved Plaintiff from his dangerous cell or had him moved, in direct contravention of jail policy and practice. As such, Plaintiff was trapped in the cell with Saunders for several days.

53. Defendant Winch refused to move Plaintiff from his cell despite knowing of the objectively serious risk to Plaintiff of leaving him in the cell. Defendant Winch was thereby deliberately indifferent to Mr. Cavness's safety.

54. Defendant Winch acted under color of state law when he deprived Plaintiff of his federal constitutional rights.

55. At all times herein mentioned, Defendant Winch knew, or should have known, that

Plaintiff was at risk of suffering harm at the hands of another inmate, but was deliberately indifferent to it, ignored it, and failed to protect him from that harm.

56. As a direct and proximate result of Defendant Winch's deliberate indifference and deprivations of Plaintiff's federal constitutional right to be protected from violence by other inmates, Plaintiff has sustained physical and emotional injuries and other damages.

57. As the prevailing party in this action, Plaintiff is also entitled to recovery of his attorneys' fees under 42 U.S.C. § 1988.

## CAUSE OF ACTION NO. 2
## CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHT TO BE FREE FROM VIOLENCE AT THE HANDS OF OTHER PRISONERS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
## (42 U.S.C. §§ 1983 & 1988)

58. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 55 above as if set forth in full herein.

59. As alleged in paragraphs 1 through 57, Defendants, and each of them, entered into a conspiracy to violate the civil and constitutional rights of Plaintiff, including violations of the Fourteenth Amendment.

60. The Fourteenth Amendment to the United States Constitution protects the rights of pretrial detainees to be free from violence at the hands of other inmates, and prohibits deliberate indifference by law enforcement officers to the risk of violence to detainees at the hands of other inmates.

61. As alleged in paragraphs 1 through 57, Plaintiff informed Defendant Winch and several of the Mainline Deputy Defendants working the mainline that he was being threatened by fellow inmate Raymond Saunders, whom Defendants knew to be violent. On information and belief, the other Mainline Deputy Defendants were aware of Mr. Cavness's complaints and the risk to his safety as well. Neither Defendant Winch, nor the Mainline Deputy Defendants moved Mr. Cavness.

14
FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
CASE 3:14-cv-03403-EDL

1  As such, Mr. Cavness was trapped in the cell with Saunders for several days.

2       62.    Defendant Winch and the Mainline Deputy Defendants refused to move Mr. Cavness from his cell despite knowing of the objectively serious risk to Mr. Cavness of leaving him in the cell. Defendant Winch and the Mainline Deputy Defendants were thereby deliberately indifferent to Mr. Cavness's safety, and violated Mr. Cavness constitutional right to be free from harm by other inmates.

     63.    Defendants agreed amongst themselves either overtly or implicitly to violate Mr. Cavness's constitutional rights by agreeing not to move him to a safe location in the face of an imminent physical threat by a violent fellow inmate, much as they deprived other inmates of their constitutional rights on prior and subsequent occasions.

     64.    Each Defendant shared the common objective to deprive Mr. Cavness of his constitutional right to be free from harm at the hands of other inmates, in keeping with the practice and culture of the Department.

     65.    Defendants, each individually and in concert with the others, acted under color of state law when they conspired to deprive Plaintiff of his federal constitutional rights.

     66.    As a direct and proximate result of Defendants' conspiracy to deprive Plaintiff of his federal constitutional right to be protected from violence by other inmates, Plaintiff has sustained physical and emotional injuries and other damages.

     67.    As the prevailing party in this action, Plaintiff is also entitled to recovery of his attorneys' fees under 42 U.S.C. § 1988.

**CAUSE OF ACTION NO. 3**
**CALIFORNIA CIVIL CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHT TO BE FREE FROM VIOLENCE AT THE HANDS OF OTHER PRISONERS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. §§ 1983 & 1988)**

     68.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs

Gibson, Dunn & Crutcher LLP

1 through 65 above as if set forth in full herein.

69.     As alleged in paragraphs 1 through 67, Defendants, and each of them, entered into a conspiracy to violate the civil and constitutional rights of Plaintiff, including violations of the Fourteenth Amendment.

70.     The Fourteenth Amendment to the United States Constitution protects the rights of pretrial detainees to be free from violence at the hands of other inmates, and prohibits deliberate indifference by law enforcement officers to the risk of violence to detainees at the hands of other inmates.

71.     As alleged in paragraphs 1 through 67, Plaintiff informed Defendant Winch and several Mainline Deputy Defendants that he was being threatened by fellow inmate Raymond Saunders, whom Defendants knew to be violent.  Neither Defendant Winch, nor the Mainline Deputy Defendants moved Mr. Cavness, despite being directly or indirectly aware of Mr. Cavness's plea and the objective risk to his safety.  As such, Mr. Cavness was trapped in the cell with Saunders for several days.

72.     Defendant Winch and the Mainline Deputy Defendants refused to move Mr. Cavness from his cell despite knowing of the objectively serious risk to Mr. Cavness of leaving him in the cell.  Defendant Winch and the deputies to whom Mr. Cavness complained were thereby deliberately indifferent to Mr. Cavness's safety, and violated Mr. Cavness constitutional right to be free from harm by other inmates.

73.     Defendants agreed amongst themselves either overtly or implicitly to a common plan to commit the tortious act of violating Mr. Cavness's constitutional rights by agreeing not to move him to a safe location in the face of an imminent physical threat by a violent fellow inmate, much as they deprived other inmates of their constitutional rights on prior and subsequent occasions.

74.     Each Defendant shared the common objective to deprive Mr. Cavness of his

constitutional right to be free from harm at the hands of other inmates, in keeping with the practice and culture of the Department.

75. Each Defendant had actual knowledge that Defendant Winch and the deputies to whom Mr. Cavness complained had not and would not move Mr. Cavness, thus violating his constitutional rights.

76. Each Defendant intended to aid the commission of the violation of Mr. Cavness's rights, and did thereafter aid in its commission by covering up Defendant Winch's and the other deputies' failures to move Mr. Cavness.

77. Defendants, each individually and in concert with the others, acted under color of state law when they conspired to deprive Plaintiff of his federal constitutional rights.

78. As a direct and proximate result of Defendants' conspiracy to deprive Plaintiff of his federal constitutional right to be protected from violence by other inmates, Plaintiff has sustained physical and emotional injuries and other damages.

79. As the prevailing party in this action, Plaintiff is also entitled to recovery of his attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter the following relief:

a. Judgment in favor of Plaintiff against each Defendant;

b. A judgment awarding Plaintiff all available damages for Defendants' violations of Plaintiff's constitutional rights, including compensatory and punitive damages under 42 U.S.C. § 1983;

c. An order granting Plaintiff his attorneys' fees under 42 U.S.C. § 1988;

d. An order granting Plaintiff the costs, fees and disbursements incurred in connection with these proceedings; and

e. Such further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a jury trial in this action.

DATED: March 5, 2018

                                           GIBSON, DUNN & CRUTCHER LLP
Rachel S. Brass, SBN 219301
Lee Crain, *pro hac vice*
Caiti Busch, SBN 318534


By: /s/ Lee R. Crain
                Lee R. Crain, *pro hac vice*

Attorneys for Plaintiff

MICHAEL CAVNESS

18

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
CASE 3:14-cv-03403-EDL